Department of Health and Human Services, et al. Oral argument not to exceed 15 minutes to the time. And for Stephen Price, we help. Good morning. Your Honor, I'd like to reserve three minutes for rebuttal. You may. If it pleases the Court, opposing counsel, when I started this case ten years ago, it was a no-brainer. Everybody that was involved in Medicaid understood that when the Court said the Medicaid proxy included those patients' days for patients who were eligible for medical assistance under state plan approved under Subchapter 19, that that included patients that were not in the traditional Medicaid but that had been included under a DISH program such as Kentucky has. Under such a DISH program, and Kentucky's program in particular… A DISH, you mean? A DISH, Disproportionate Share Hospital, Your Honor. It's now recognized, I used to have to brief this, but it's now recognized and admitted by CMS that a hospital that treats a disproportionate share of indigent patients, low-income patients, has additional costs that aren't recognized or aren't paid for in the DRG methodology of paying for that patient care. So, for instance, if I go to the hospital and… Okay, but DISH generally is, if you use that term, is accepted. The question is how you compute it and whether you can, if I understand it right, is, in effect, whether you can up your Medicare share payment by pumping more people into your Medicaid population, your Medicaid treatment population, even if they're not Medicaid eligible. Is that a fair statement of it? That's pretty close, Your Honor. Make it even closer if you wish. Well, I mean, you're not, in Kentucky, and then I have to put in a little caveat here. There's a saying, there's an adage, when you know one Medicaid program, you know one Medicaid program, and I think that's important in these cases. So when it comes to… Because there's so many waivers and so many variations. Well, and different ways of doing it, and what's also important, Your Honor, is what somebody calls Medicaid in one state, they might call something different in another state, or sometimes indigent care is used one way in one state and it's used differently in another state. A lot of these cases that have gone against the hospitals in other states talk about general assistance days as if they were part of… When you say other, are you referring to the Ninth Circuit and D.C. Circuit cases? Yes, Your Honor, as well as a number of district court cases also. But there's been a lot of confusion, or conflation maybe is the word, between what are dish payments that pay directly for an expansion of the Medicaid program through a population paying directly for that care as we do in Kentucky, and other dish programs that do not pay directly, but pay indirectly through maybe through where it's more of a proxy, or maybe they're using it… But isn't the whole issue here not the overall label, but whether your computations are trying to include people who are not in the conventional sense, quote, Medicaid eligible, that is these people who are on the KHCP, they're not people that are Medicaid eligible in the overall statutory sense, and you're trying to get them into the computation. Isn't that really the basic issue here, whatever label you give to the program? I think the basic issue, Your Honor, is a little bit different, and that is whether these are people that are provided medical assistance under a state plan, a Title XIX approved state plan, and they are. In order to have a Medicaid program, it's required that you have a dish program, and that has to be approved by the Secretary, and there's different ways… Judge Boggs stated it is correct or is not. It is, isn't it? I mean, he's just stating the issue. That is the issue, isn't it? That is the issue, Your Honor, but we're not pumping it up. What we have done in Kentucky is we've, in essence, expanded our Medicaid program to another population, a population… People who don't get Medicaid but get KCHP, right? Right. Additional low income people. Additional low income… Who do not qualify for Medicaid. Well, they could qualify for Medicaid. But they can't be in the KHCP program if they qualify for Medicaid. That's right, under Kentucky's program and the manner in which it's set up, but what Kentucky has done is you have categorically needy people and you have medically needy people. Categorically needy have to, I'm sorry, medically needy have to be included in your Medicaid program. Categorically needy don't, and you can include some of them, you can include all of them. Generally speaking, and very roughly, and I'm sure there's exceptions and categories and so forth, you're talking about a group of people who may be not be insured but they're not low income, the income is not low enough to get them into Medicaid. Right, they're not as low as Kentucky… They may be at the poverty level or some other standard, but they're not low enough to get into it. They're earning more money a little bit, or they have more resources a little bit than the Medicaid people. Then Kentucky would allow in its traditional Medicaid program, that's correct. Now in some other state they might be included because… We're not in some other state to point it out. Well, no, but the important thing about this is Kentucky has expanded coverage by putting these people in their KHCP program. If you're a poor state like Kentucky, that's a smart way to do things. If you put them all in your, if you put all the categorically needy in your Medicaid program, you still have to have a DISH program that then adds, that pays additional compensation and you have to do it through some other means. The smart thing if you're a poor state like Kentucky is put the medically needy in there, put some of the categorically needy, as much money as you think you have with your 30 percent match that you have to put up. Put the rest in your KHCP program. That way you're satisfying your DISH requirement, but you're also expanding care to this population. And if you didn't do that, you'd have, if you put them over here, you'd still have to come up with a DISH match. So if you're a poor state like Kentucky, that's how you expand the Title 19 plan to cover more people. It's an expansion population that's covered. Now if you get into, and in Kentucky an important distinction that we make here is Kentucky then pays for that care directly. The hospital has to provide care to those KHCP patients that don't get a DISH payment. The amount of the payment is determined by the days of care that you get. It's multiplied times a per diem amount that is supposed to be the cost of providing for that patient and that's the payment that the hospital gets. If you look at the Adena case and other cases, they talk about these patients are in those other states are not paid for directly under the DISH program in that state. And then they get off into things like charity care and generally assistance days and I think totally get off track with that. I don't think anybody disputes that there is a problem that is trying to be addressed here. There is no question that these small hospitals take a disproportionate share of low income patients and paying patients are drained off somewhere else. I don't think anybody disputes that. I think the problem and what we need to understand from you is how this statutory framework works because this is a very complicated series of Medicare and Medicaid DISH provisions and calculations. So it seems that we are bound by the very particular way that these statutes define the categories that are going to be covered. So how is it that you can make your group that you want to include, the Kentucky Hospital plan, fit within the definition because it seems to me that you have some problems with enabling you to get the Medicaid fraction to include this category of people that your plan defined as non-Medicaid eligible? Well I think, Your Honor, the way that we do it is once again to go back to the plain language, 1395W, which talks about medical assistance. I don't think it is disputed now that these people do receive medical assistance. The medical assistance definition has 29 enumerated services and 13 enumerated individuals. I don't think you fit within both of those categories. How do you do that? Well, Your Honor, we do definitely provide the same. No question you provide the services, but are you one of the 13 enumerated individuals? We do not fit within the 13 enumerated individuals, although we may have individuals we may have categorically needy in our Medicaid program. How do we get around the statutory definition of 13 enumerated individuals? Well, Your Honor, it is only if you go over into the Medicaid statutes and link medical assistance to those enumerated individuals that you have an issue there. I don't think it is proper to link medical assistance and tie it only to those enumerated individuals. That is what the statute says, though, right? That is what the Medicaid statute says, but that is not what the Medicare statute says. And I think if Congress had... The words are defined differently from Medicare to Medicaid? Well I think you have to put them in their context. And I think if Congress had meant to limit it just to those enumerated types of individuals, they would have said so in the Medicare statute. They could have said very easily medical assistance for the category... Medical assistance under the statute, right? Under the state plan approved under Subchapter 19. DISH payments, DISH patients are receiving medical assistance under a state plan approved under Title 19. If Congress had meant to limit it, they could have said medical assistance for medically and categorically needy individuals under a state plan. Part of the issue here, too, is we have that plain language in the Medicare statute. We also have the intent of Congress, which is to be expansive. And I think they are being expansive by using that language instead of using a word like Medicaid eligible or by 2005 they demonstrated, I think, with the DRA in which they said the secretary has been including patients who are not eligible under Title 19 programs at all, the 1115 waiver populations, but has been including individuals... But isn't that the very essence of the legislative prerogative? That if they want to choose the 1115 category for waiver programs, they can do it. And we are bound by that, if yours is not one of those named exceptions. Well, I agree with Your Honor on that, except for I think what they have demonstrated, well, for one, the only exclusion they put in the Medicare statute is those patients that also are eligible under Part A. So they know how to exclude people when they want to exclude people. And they didn't exclude the Medicaid dish population that directly receives medical assistance here. The other thing is what they have said when the DRA was passed is they have said, in essence, the secretary was including people that were approved under Title 11 and not Title 19, so they don't fit in the language of the statute as we have given it. But by golly, they are right. The secretary is right. We are going to give the secretary discretion to include people outside of Title 19 because we do want this to be expansive, because we do recognize that the purpose behind this whole exercise that we are going through is to make sure that hospitals that treat disproportionate shares of indigent people receive the additional reimbursements that they are entitled to. Any other questions? Let me ask one question, just because the tongue tends to trip over front of you, but at page 4 of your brief, in the overview statement, it says appellants are Medicare DSH. The Medicare Act increases the amount of their Medicaid reimbursement. And I read the other brief using Medicare at that point because the reimbursement that we are arguing about is a Medicare reimbursement, is it not? That's right, Your Honor. I don't quite see that under the pressure. Line 6 of page 4, and that was what I stumbled over, and it may just, in effect, may just be a typo. I don't think it affects your legal argument, but the sixth line of page 4 increases the amount of their Medicaid reimbursement through the Medicaid proxy. That's what I'm looking at. I'm not sure if my page is matching up, Your Honor. I would agree that would be a typo. Okay. All right. Unless you come back at me, I'll edit that because it threw me off for a while. Thank you. I'll look at it and pass it down here. You'll have your three minutes for rebuttal. May it please the Court. Carleen Zubricki for the Department of Health and Human Services. As I take it, the Court understands the phrase eligible for medical assistance under a state plan approved under subchapter 19 is the technical way of referring to eligibility for Medicaid. It's undisputed in this case that KHCP patients are not eligible for Medicaid under Kentucky's state plan and under the very precise statutory formula that Congress created here. That's the beginning and end of this case. Three courts of appeals are eligible for something which is within a plan under Medicaid or something like that. I'm sorry. Could you say that one more time? They say that they are getting benefits under a plan that's approved by the provision that provides for Medicaid. To be clear, the Secretary does not approve KHCP. That's a Kentucky state legislative initiative. What the Secretary does approve is the state's Medicaid plan, which is the care to the specified groups of individuals. One part of the Medicaid plan that has to be approved is the way a state chooses to distribute Medicaid dish payments. The Secretary does have to confirm that the Medicaid plan meets all of the federal requirements, including the way they distribute dish payments. That doesn't somehow convert a state initiative that's sort of cross-referenced there into a state plan that is the subject of the Secretary's approval. So you're saying the Secretary doesn't or maybe even can't turn these non-Medicaid-eligible people into Medicaid-eligible people by approving a plan or waiving it. Let me ask you about what I call the Ninth Circuit case. The Ninth Circuit is Washington Med Center v. Sebelius. Third Center is Adena Regional v. Levitt. Your adversaries seem to say, well, they have different names and they're somewhat really different. Are they the same as our case here, or are they different in meaningful ways? I think they're indistinguishable from this case in any material sense. In all three circuit courts that have addressed this question, the Third Circuit also affirmed the district court decision in the Cooper case and expressly sort of adopted the district registry. It came to the same conclusion, but it used a different Chevron analysis. It did. It did. And the D.C. Circuit and the Ninth Circuit have both held that this is Do you have a preference for which way? Do you win or you don't care? We think this is a Chevron step one case. We think that the statute is clear. It uses the phrase that Congress uniformly uses when it means to refer to Medicaid-eligible individuals, which is a well-understood term. But in all of those cases, you know But even if it's ambiguous, you win under Chevron, so it really doesn't make too much difference, right? I'm not sure it makes a difference. I do think the Secretary in this case, we understand the decisions below as having done a Chevron step one analysis. We think that they believe that it was compelled by the statute. Well, if we do it under Chevron step one, then it becomes impossible for your client to change her mind. That's true, but I mean, that is our understanding of the statute. The Secretary does, is of the view that this is compelled by the statute. Your opposing counsel makes, I think, a very fair argument for the intent of Congress in that Congress has, in fact, recognized the need of many small community hospitals who take a hugely disproportionate share of indigent clientele and treat them. Why doesn't that congressional intent inform your evaluation of the statute? Well, I think that may have been the overarching intent, but Congress chose a very particular mechanism for achieving that intent, and that particular mechanism, you know, balanced all sorts of different considerations, including, for instance, sheer administrability. You know, their legislative history makes clear that Congress thought about, you know, making hospitals count all low-income patients, and it expressly rejected that approach and decided to use a proxy, a sort of rough proxy. I would also remind you that, I know this all gets sort of a little bit confusing, but we are in the Medicare statute here, right? And the overarching purpose of the Medicare low-income patients that's tied into this is that the Medicare statute includes a DISH Medicaid calculation. Yes. So Congress put it in there. No, no, no. So then the question becomes, who qualifies for that? And I recognize that there are very particular exceptions. Your opposing counsel would suggest that this may be one that fits. I know we have 1115. We know we have PICL amendments, the urban hospital, the recognition of the cost in the urban centers to treat the indigent. Your argument is very simply that we have to look at the words of the statute, and it does not cover this category. Well, yes, that is our argument. With respect to the PICL DISH, I mean, that's not an exception. The statute sets forth just two different ways of calculating these DISH payments. They're not flip sides of each other. They're just sort of two different ways that cover groups with slightly different sort of concerns that were motivating Congress. The PICL DISH is sort of tied to the ways that a hospital gets revenues and the total number of revenues, and it's for, as you said, a number of urban hospitals. The statute that we're talking about here, it's tied to patient days and eligible patient days. And again, Congress told us which patient days those were. In terms of policy, isn't it, Congress wants to help these hospitals, but not in a limitless way. Exactly. It has to choose some limit. And was I really fair when I put to your adversary that this is a way that the state attempts to pump up their Medicare reimbursement, or maybe even doesn't attempt to do it, but it's a side effect of by putting in this K-CHIP program, they now want to argue that it pumps up their Medicare reimbursement? I think that's accurate. The other thing I would note is that this is a longstanding interpretation of the Secretary's. The hospitals have cited to a number of intermediate decisions by the PRRB that came out the other way, but in the Hackensack and Ashtabula cases, the administrator, who's the higher body, has consistently overruled those decisions and has had the same interpretation that we're putting forth here for a quite long time, long before ADENA. You used an acronym. Was it RD? Is that Regional Director? You said something that sounded like RD or RB. I'm sorry, the PRRB, the Provider Reimbursement Review Board. Reimbursement Review Board. Okay, got it. That one I've heard of. But yes, I think that that is essentially what's happening here, and I think Congress was quite clear about its intent. Again, there are other places where Congress refers to low-income patients, and in fact, where it refers to the exact same phrase that we're Congress knew how to do this more expansively if it wanted to, and instead, it took the approach that you see here, and I think that... I don't want to interrupt my colleague's colloquy, because I'm learning from it, but I want to ask a question about the constitutional issue, and not really so much how to resolve it, because it's very hard for a plaintiff to win a rational basis challenge to a statutory distinction. But there is such challenge here, at least made at this level, and we can either deal with it on the merits, or we can deal with it on the grounds that it's not properly addressed. And I'm a little bit... I take it that your argument is that it's not before us, and it's not before us, although it's raised, but the argument is it wasn't raised before the PRRB. And I take the cases that support that to be along the lines of 405H, Social Security Act, and so forth, which say that you have to go through a certain procedure. But I always took, and I'm, you know, wearing another hat, I had a lot to deal with the 405G and 405H and so forth, so I'm a little bit familiar with it, but not with more recent cases that have tangled with it, okay? I always took it to be that you had to go through, you had to go to the right agency and get a final decision from the agency before you could have jurisdiction in court. But I didn't ever take it as you had to raise certain issues before those issues could be in court. Is that clearly the law? Because I took the cases to be cases where, you know, for instance in this context, you had to go to the PRRB, you couldn't go through 1331 and just challenge this rule as a violation of equal protection. You couldn't do that because you lacked jurisdiction, because the jurisdictional basis to raise such a challenge is to go through the PRRB, right? So, but then if somebody goes through the PRRB, they get a final decision from the PRRB, and now when they go to court, they raise the argument that they can only win on in court, and they're told, well, you didn't, we don't have jurisdiction to hear that issue because you didn't raise it before an agency that didn't have power to decide it. Then I'm wondering if that's a proper statement of the law. Are you with me? Yeah, I am with you. I think that is how the law works in this area. I'm sorry? The hospitals raised this argument. We're reviewing a final decision of the administrators here, and the hospitals raised this argument for the first time after the record was closed in this case, after the procedural rules of the board established that no new arguments are to be made. But if they made the argument, the agency that they're addressing it to could not have ruled in their favor on that argument. But even the jurisdictional provision that we're looking at here, the 1395-00-F, expressly provides what's supposed to happen if you are raising an argument that you don't think that the board is going to be able to consider. What's that say? It essentially explains that what you do is you raise the issue to the PRRB, and this is 1395-00-F1. It may not be elaborated at length, but this provision is certainly cited in the briefs. It says that you have to raise to the PRRB a constitutional issue that the PRRB cannot rule on. It explains a mechanism by which you can obtain judicial review of issues that the PRRB can't rule on. Is that a mandatory methodology or a permissive methodology? You know, I take it to be mandatory, but even if the court concludes that it were permissive in some ways, you know... Well, then 405-H would, or whatever the equivalent of, whatever the language that incorporates 405-G and 405-H would look in. Right. And the, you know, the Secretary's decision here was this was not an argument that you guys appropriately raised at the appropriate time in our proceedings, and for that reason it didn't address the question. So I think even if the court concluded that for some reason that was wrong, I do think that that would need to go back to the agency to allow the agency the chance. We don't have jurisdiction to consider it? It seems like a waste of everybody's time. We really don't have jurisdiction, right, under precedence? That's correct. It's strange. It's totally consistent with Marbury v. Madison. The Supreme Court has said with respect to law, the Constitution... The Equal Protection Clause is not self-executing with respect to agencies. You've got to have a court tell them to do it. Well, conversely, is it completely clear that the agency could not decide that something that it's doing violates the Constitution? I mean, your citation on page 40 seems by omission to the Nuclear Energy Institute case, it says, issues not raised or waived will not be considered, and then you say because the Secretary has not issued a final decision on the equal protection arguments, I read that as saying if the Secretary wanted to, I mean, can't an agency say we're not going to enforce something that's unconstitutional? I mean, the Solicitor General sort of did that in the gay marriage cases. I mean, I think that I'm not entirely clear on the scope of the agency's authority to ultimately resolve that issue. I do know that the agency has a process by which it determines whether or not it thinks it has the authority, and I think that there are also institutional reasons that even constitutional and various sorts of legal challenges that go to the PRRB, or, you know, that could be heard by a court, should be filtered through the agencies to provide them with an opportunity to think about those issues as they make all of their various administrative rulings. It's not like they might say, oh, we want to interpret it to avoid a constitutional issue or something like that. Exactly. What's your best case for the idea that the jurisdictional limitation in 405H that carries over into the Medicare statute is one that deals with issue exhaustion rather than claim exhaustion? In other words, you can have exhausted all those remedies, but if you haven't brought up some additional issue that leads to reversal of what the agency did, that then that's a jurisdictional, you know, the Supreme Court has told us to be very careful about what's jurisdictional and what's not jurisdictional, that that leads to a jurisdictional limit on our ability to address that issue when the claim for relief has been carried through all of the administrative procedures properly, but an issue that would have led to a different claim for relief wasn't made. Do you understand what I mean? I do understand your question. What's the case? I'm not sure I have the best case for you off the top of my head right now and I'm happy to submit something. Well, if you find one, I'd like to know. I don't want to speak for the presiding judge. That would be subject to a supplemental authority if you file under 28J. I would be happy to do that, yes. And opposing counsel, if you find something that says the opposite, that would be. True, too. Okay. Thank you, counsel. Thank you. Three minutes for rebuttal. Yes, Your Honor. Page four of that is a typo. Okay. It's easy to do. I was in front of a judge once on a Medicaid case and he said, I have to start paying attention. This is going to be on this soon. I'm 60 years old. And I said, oh, no, I'm in trouble. As far as equal protection is concerned, that was raised just briefly at the PRB level and then it was raised with the administrator who refused to address it, but there's a Cooper decision. Didn't the administrator say that it wasn't properly raised? I think that's what he said, Your Honor. It's been a while since. That was wrong. I'm sorry? That was just wrong? The administrator said it wasn't raised before the PRB? Yes. And it was just briefly raised, but there was a Cooper decision, a district court decision on this that came out a few months ago in which the court said that equal protection issue could not have been raised and so it's not waived or it could have been brought before the PRB, so we're going to address it here. Now that court didn't agree with me, so it's not good in that sense. But once again, those courts, and as I read the Adena case and the more I read it, I don't know that I disagree so much with it because it's once again, it's more decided on the facts. They're not really saying the interpretation of the law is wrong in Adena, but they say that the HICAP patients in Ohio were not eligible for medical assistance because they weren't paid, the hospitals weren't paid for treating those patients. And then later on, they say that, well, they talk about direct payment, but I mean, once again, Ohio might do it differently than Kentucky, but in Kentucky, we're directly paid by this Title 19 state plan with a KHCP dish provision for treating those patients. And then if you get down in like the Washington case, University of Washington with the Ninth District, which Boggs was asking about there, I mean, they were talking there about a general assistance unemployment and a medical assistance indigent program that were state programs and what the state did is when they ran out of money, then they started tapping into the dish program. But it was, and if a hospital was not a dish hospital, they went ahead and paid them under their general assistance and their medical MI program. And so that was a different set of facts there. That was where, at the very most, their dish program was treating patients as a proxy, but we don't treat patients as a proxy. These KHCP patients are not proxies, but they're patients who get paid. They go in, they have to qualify to get a card, and the old adage, if it looks like a duck and walks like a duck and quacks like a duck, it must be a duck. They look exactly like the Medicaid patients. They get the exact same care. The only difference is the hospital gets paid about half of what they get paid for treating the Medicaid patients. And Congress recognizes that, and under the ACA now, these KHCP patients are starting to become ACA patients. And so the federal government, instead of paying 70 percent, 50 percent of the cost of treating these patients, is now starting to pay 100 percent, which is, in Kentucky, 100 percent of 75 percent of the cost of treating these patients. And so Congress recognizes that these are patients that... Does that affect, going forward, this whole argument? That is, when you say they come under the ACA, is that going to change the argument on either side? Well, it may moot this issue eventually. That's not clear at this point in time, Your Honor, because... You're talking about historically. Yeah. Historically, it doesn't change the argument, other than to evidence, once again, Congress's And every hospital in Kentucky is a dish hospital, except for Kosair Shriners Hospital that doesn't take Medicaid money. And you get hospitals out in the state, in Kentucky, 70 percent of the reimbursements are government reimbursements. So if you're dependent on Medicaid and Medicare for reimbursements, you are in trouble. And so I would agree, I mean, this is not a deliberate attempt to pump up Medicare reimbursements, but it is a side effect, and it's a side effect that Congress has condoned, that Congress intended, and once again, with the DRA, in saying, all right... It's an effort to save closure of small community hospitals. That's right. That's right. Not just small community, safety net hospitals, which are the ones that are treating large numbers of... Counsel, I think your time has expired, unless my colleagues have anything else. Thank you all for your time. Counsel, the case will be submitted.